**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>**v.**<br><br>**MELISSA FARRIS,**<br><br>**Defendant.** | **Case No. 26-mj-00140** |

**GOVERNMENT'S MOTION FOR RECONSIDERATION OF THE COURT'S DENIAL OF THE GOVERNMENT'S REQUEST FOR DETENTION**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this motion for reconsideration of the Court's denial of the Government's request for pre-trial detention of Melissa Farris (hereinafter "Defendant").

On August 17, 2026, the Court denied the government's oral request for detention and released Defendant without imposing electronic monitoring or a third-party custodian. Because the Government believes Defendant is a risk of flight and that the conditions imposed by the Court are insufficient to ensure her compliance and future appearance, it respectfully moves the Court for reconsideration of Defendant's release. The Government further requests the Court add electronic monitoring and a suitable third-party custodian to its release conditions.

## INTRODUCTION

The World War II Memorial on the National Mall in Washington, D.C. honors the 16 million members of the Armed Forces that served—and the 405,399 armed forces members that died—for the United States of America during the largest and deadliest conflict in human history. The Memorial is a tribute so the world never forgets "[o]ur debt to the heroic men and valiant

women in the service of our country [that] can never be repaid. . . ."[1] Over five million people from around the world visit the Memorial annually and are reminded of America's triumph over evil and the selflessness of the Greatest Generation.

On August 13, 2026, in a brazen and heinous display of selfishness, Defendant—while livestreaming herself on social media in an attempt to solicit money—spray painted the balcony wall of the World War II Memorial's Atlantic pavilion and dumped a substance into the fountain causing the water to foam. In doing so, she disrespected and dishonored the heroic men and women that served our country during World War II; Defendant also caused significant disruption and damage to a nationally cherished monument.

Because of her conduct, the National Park Service was forced to immediately close sections of the Memorial, redeploy maintenance personnel, and initiate specialized cleanup and water-treatment procedures. These unplanned emergency responses diverted limited resources, generated unnecessary expenses for the city and the Park Service, shut down the public's access for several hours, and jeopardized the preservation of a sacred site dedicated to Americans who sacrificed their lives for freedom.

Defendant's actions, as well as her history and characteristics, demonstrate that she presents a serious risk of flight and non-compliance with release conditions that requires her detention pending trial. Defendant was defiant and outspoken before, during, and immediately after committing her crimes. Her attitude only changed after she did not receive the attention she so desperately craved, demonstrating that any expressed remorse is insincere. Defendant also has a history of criminal misconduct and non-compliance with court orders. Indeed, just days before

[1] President Harry S. Truman, *Address Broadcast to the Armed Forces* (April 17, 1945). This is one of many quotes inscribed into the walls of the World War II Memorial that honors the greatest generation who fought and died for our freedoms.

her attack on the Memorial, she was cited for camping on Federal property. Rather than curb her behavior, her criminal activity on federal property escalated to two felonies. Defendant has no ties to the Washington D.C. area and no stable support system to ensure that she will comply with any release conditions. Considering the factors specified under 18 U.S.C. § 3142(g), there is no condition or combination of conditions that will reasonably assure Defendant's appearance in court or compliance with conditions of release. Accordingly, the Court should detain her pending trial and reconsider its denial of the government's request for detention.

## BACKGROUND

### *August 13, 2026 Damage to the United States World War II Memorial*

On or about 2:00 p.m. (1400 hours) on August 13, 2026, members of the United States Park Police ("USPP") and United States Park Rangers responded to a call for a disorderly person disrupting visitors in the area around the National Mall, specifically at the World War II Memorial. A witness reported that they observed an individual, later identified as Defendant, spray painting graffiti on portions of the Atlantic Theatre Pavilion of the World War II Memorial.

As a United States Park Ranger responded to the call, the Ranger observed foam in the fountain area of the Atlantic pavilion.



***Figure 1. Photograph of Foam in the Fountain at the World War II Memorial.***

The Ranger then observed multiple people gathered around the balcony watching Defendant videotaping herself. After Defendant became aware of the Ranger's presence on scene, she fled the crime scene.

The witness took a photograph of Defendant which was recovered by law enforcement (Figure 2). In the photograph, Defendant is carrying a backpack, a large plastic tube with a strap, and a white plastic bag. Additionally, the photograph clearly depicts Defendant holding a can of spray paint in her right hand as she actively vandalizes the World War II Memorial's Atlantic pavilion by spraying graffiti onto its surface.




***Figure 2. Photograph Taken by Witness of Defendant Appearing to Spray Paint Portions of the World War II Memorial.***



***Figure 3. Enlarged Photograph Taken by Witness of Defendant Applying Spray Paint to Portions of the World War II Memorial (Circled).***

Specifically, orange-colored paint was sprayed onto the wall with the words: "Clean Hands Dirty $." Additionally, green-colored paint was also sprayed onto the wall just under the orange spray paint.




***Figure 4. Photograph of the Northern Entrance Balcony of the World War II Memorial.***

Pink-colored paint was splattered on the ground of the balcony between the wall and the inscribed years of the war (1941-1945).




***Figure 5. Photograph of the Northern Entrance Balcony of the World War II Memorial.***

Furthermore, shards of glass and a broken plastic top were recovered from the ground, which had been splattered with paint.



***Figure 6. Photograph of the Base of the Northern Entrance Balcony of the World War II Memorial.***

Law enforcement recovered two white signs with painted letters from a nearby trashcan and a bottle of MTN 94 spray paint from the memorial fountain.



***Figure 7. Photograph of Recovered Signs.***




***Figure 8. Photograph of Recovered Spray Can.***

The first sign read, "Slip N Slide." The words were painted in orange, green, and pink letters, respectively. The second sign read: "SWITCHBOARD 202-224-[redacted]," "Ask your State Rep to Account for the FORD GREEN ENERGY GRANT," "$[redacted] on CASHAPP," "They Stole union Health [and] Welfare and made union men [and] women pay for it.)"




***Figure 9. Photograph of Two White Signs Recovered by Law Enforcement.***

The phone number on the second sign is the public phone number for the United States Capitol switchboard, which directs callers to the appropriate member of Congress.[2] USPP identified Defendant after her photo was circulated and a USPP officer recognized her as a woman who was illegally camping on Federal property just three days earlier.

***<u>August 10, 2026 Citation by USPP</u>***

On August 10, 2026, at around 11:54 p.m. (2354 hours), USPP officers responded to complaints regarding a hammock hanging from a tree in Rawlins Park (located on E Street NW

[2] https://www.senate.gov/general/contacting.htm.

between 18th Street NW and 20th Street NW).[3] When officers arrived, they observed a hammock suspended between two trees on the northeast side of the park obstructing the pedestrian walkway. A dark colored backpack and large clear tube hung from the strap connecting the hammock to the tree.



***Figure 10. Photograph of Defendant and Hammock in Rawlins Park.***

Seated to the right of the hammock was Defendant. The Kentucky identification card listed Defendant's home address being in Elizabethtown, Kentucky. USPP officers informed Defendant that she was not permitted to camp in the park and she was issued two United States District Court Violation Notice citations for violations of 36 CFR 1.5(a)[4] and 36 CFR 2.1(a).[5] During the interaction with law enforcement, Defendant questioned the officers' authority and was live streaming the arrest through her social media accounts, including a public Facebook account associated with username Melissa Lovewell.

---

[3] In prior filings, the Government listed the address as being at the intersection of Virginia Ave NW and 18th Street NW and Virgina Ave NW

[4] Violating a closure, designation, use or activity restriction or condition, schedule of visiting hours, or public use limit.

[5] Possessing, destroying, injuring, defacing, removing, digging, or disturbing a structure or its furnishings or fixtures, or other cultural or archaeological resources within National Park System units.



***Figure 11. Photograph of Defendant in Rawlins Park Appearing to Livestream Interaction with Law Enforcement.***

During her interaction with USPP about unlawfully camping in the park, Defendant indicated that she had been pushed out of her residence. USPP officers provided Defendant with a list of homeless shelters. Shortly after being issued the two citations, Defendant posted a photograph of the citation paperwork to her public Facebook account.




***Figure 12. Screenshot of Defendant's Public Facebook Account Post of Photograph of United States District Court Violation Notices (Circled).***

***<u>Review of Defendant's Livestreamed Statements on Her Public Social Media.</u>***

After identifying Defendant, law enforcement reviewed her public Facebook and Instagram accounts, both of which used the username of Melissa [redacted]




***Figure 15. Screenshot of Defendant's Public Instagram Account Profile.***




***Figure 16. Screenshot of Defendant's Public Facebook Account Profile.***

The review revealed that Defendant recorded multiple livestream videos on August 13, 2026—including a recorded video of her admitting to damaging the World War II Memorial. Indeed, Defendant posted a public livestream video before she defaced the World War II Memorial and stated, "I am cognitively aware and executively (sic) of the choices I am making and I am doing so to push my whistleblower case into the courtroom . . . someone has to make choices that are different and I am accountable for my actions. I am going to make these choices today and I will step foot into the courtroom and I will wait to be arrested . . . I am accountable for the things that I do and the choices that I make and our government needs to be accountable for their choices too."




*Figure 17. Screenshot of Livestream Video Posted on a Public Facebook Account Profile Associated with Defendant.*

In the livestream video, Defendant can be seen holding a sign that reads "SWITCHBOARD" and includes a partial telephone number. In the background, the World War II Memorial's distinctive columns and wreaths are visible. Additionally, in the livestream video, Defendant is wearing yellow sunglasses and a blue jacket consistent with the yellow glasses and jacket worn in the photograph taken by the witness who originally reported the crime.



***Figure 18. Enlarged Photograph of Defendant taken by Witness.***



***Figure 19. Zoomed-In Screenshot of Livestream Video Posted on Defendant's Public Facebook Account.***

Additionally, the sign that Defendant is holding in the video is consistent with the sign that law enforcement recovered from near the offense location at the World War II Memorial.

Defendant also posted a video on August 13, 2026 to her public Facebook page showing the World War II Memorial fountain filled with a foam-like substance and the vestibule spray painted. Further, she recorded herself saying, "Nobody cares, why doesn't anybody care, this is unreal." Similarly, on August 13, 2026, at 3:58 p.m. (1558 hours), Defendant posted a video to her public Facebook feed stating, "Anybody watching this please make an edit of the live, highlight the good parts, make me look fancy, get it all over the internet, why the fuck didn't I get arrested? You don't think that's weird . . . ."

Later in the same video, Defendant stated "I was just allowed to deface Federal fucking property, and nobody batted an eye, and that is very strange." In another public Instagram story, Defendant stated "so I imagine the police will be coming for me soon and I would like to have it recorded for my own safety, recording for my own safety, you know, keeping it real . . ."




***Figure 20. Zoomed-In Screenshot of Livestream Video Posted on Defendant's Public Facebook Account Profile.***

***<u>Defendant's Arrest on August 14, 2026</u>***

On August 14, 2026, around 9:27 a.m., Defendant went to the United States District Courthouse in Alexandria, Virginia and stated that she was there to turn herself in for spray painting the World War II Memorial. Members of the United States Marshals Service spoke with Defendant who admitted to spray painting the World War II Memorial with spray paint and pouring detergent into the fountain.

Law enforcement officers observed that Defendant had a large, distinctive tattoo on her left leg depicting an octopus and a ship. That tattoo is consistent with the tattoo that was documented on the photograph of Defendant taken on August 13, 2026 during the vandalism of the World War II Memorial.



*Figure 21. Photograph of Defendant on August 13, 2026 (Enlarged).*



*Figure 22. Photograph of Defendant on August 14, 2026 (Enlarged).*

***<u>Property Recovered from Defendant on August 14, 2026</u>***

After Defendant was arrested, law enforcement recovered from her person, *inter alia*, a cellphone, the two United States District Court Violation Notices that were issued to Defendant on August 10, 2026, a CVS Pharmacy store receipt for two bottles of Dawn Ultra dish soap, and several documents related to an alleged whistleblower claim.



United States District Court
Violation Notice
Location Code: FV63
Violation Number: E 2807705
YOU ARE CHARGED WITH THE FOLLOWING VIOLATION
Date and Time of Offense: 08/10/2026
Offense Charged: 36 CFR 1.5 (f)
Place of Offense: Rawlins park
Offense Description: Factual Basis for Charge: Closure & public use limits Hammock without permit
DEFENDANT INFORMATION
[redacted]
VEHICLE
APPEARANCE IS REQUIRED
A ☒ If Box A is checked, you must appear in court. See instructions (on reverse side).
N/A
PAY THIS AMOUNT AT www.cvb.uscourts.gov
APPEARANCE IS OPTIONAL
B ☐ If Box B is checked, you must pay the total collateral due or in lieu of payment appear in court. See instructions (on reverse side).
$ Forfeiture Amount
+ $30 Processing Fee
$ Total Collateral Due
YOUR COURT DATE
Court Address: 333 Constitution Ave NW Washington DC 20001
Date: TBD
Time: TBD
X Defendant Signature
Defendant Copy

United States District Court
Violation Notice
(Rev. 1/2020)
Location Code: FV63
Violation Number: E 2807704
YOU ARE CHARGED WITH THE FOLLOWING VIOLATION
Offense Charged: 36 CFR 2.1(a)(6)
Place of Offense: Rawlins Park
Offense Description: Factual Basis for Charge: Disturbing a structure / defacing structure
DEFENDANT INFORMATION
[redacted]
VEHICLE
APPEARANCE IS REQUIRED
A ☑ If Box A is checked, you must appear in court. See instructions (on reverse side).
N/A
PAY THIS AMOUNT AT www.cvb.uscourts.gov
APPEARANCE IS OPTIONAL
B ☐ If Box B is checked, you must pay the total collateral due or in lieu of payment appear in court. See instructions (on reverse side).
$ Forfeiture Amount
+ $30 Processing Fee
$ Total Collateral Due
YOUR COURT DATE
Court Address: 333 Constitution Ave NW Washington DC 20001
X Defendant Signature
Defendant Copy

*Figure 23. United States District Court Violation Notices Recovered from Defendant on August 14, 2026.*




***Figure 24. CVS Receipt from August 13, 2026 Recovered from Defendant on August 14, 2026.***

Law enforcement also recovered from Defendant eight pages of documents related to an alleged whistleblower claim. Defendant lists her own name in the first line of the document titled, "WHISTLEBLOWER." Another document titled, "Script for Constituent Switchboard Call, outlines a proposed message to leave for members of Congress. Those documents are consistent with the sign recovered by law enforcement near the World War II Memorial and the sign that Defendant holds in a Livestream Video posted on her public Facebook account.




***Figure 25. Sign Recovered by Law Enforcement.***



***Figure 26 Screenshot of Livestream Video Posted on Defendant's Public Facebook Account.***

Additionally, the sign recovered by law enforcement, and the sign that Defendant appears to be holding in the livestream Facebook video, includes the CashApp username $[redacted]. [redacted] public Facebook page, she includes that same CashApp username admitting to

"panhandling America" and saying, "Cash at me so I don't starve! $[redacted]




***Figure 27. Screenshot of Defendant's Public Facebook Account Profile (Highlighted).***

***<u>Defendant's Statements to Law Enforcement on August 14, 2026</u>***

On August 14, 2026, Defendant spoke with law enforcement and admitted to purchasing three cans of spray paint from "Blink Art Supplies" at 1120 19th Street Northwest Washington, D.C. 20036 on August 12, 2026. Law enforcement subsequently recovered a receipt from the Blick Art Materials store in Defendant's name and dated August 12, 2026 at 3:40 p.m. for a purchase of three cans of spray paint.




***Figure 28. Blick Art Materials Receipt Dated August 12, 2026.***

Defendant further stated that she spray painted "clean hands, dirty money" on the World War II Memorial as part of a protest and admitted that she livestreamed her actions. She also told law enforcement that she traveled to Washington, D.C. via bus on July 21, 2026 from Toledo, Ohio and that she is homeless and has been living on benches.

***<u>National Park Service's Estimate of Damages to the World War II Memorial</u>***

Defendant's actions caused significant damage—both monetary and non-monetary. Members of the National Park Service and contractors were responsible for the clean-up and restoration of the damage caused to the World War II Memorial. A preliminary estimate of the total costs to clean and restore the memorial already exceeds $1,000.00.

Equally important are the non-monetary damages. Defendant's actions caused the World War II Memorial—a National Monument visited by over five million people annually—to close for most of the day. People from around the world were deprived of their chance to pay their respects at one of the Nation's most important Memorials.

**<u>PROCEDURAL HISTORY</u>**

On August 14, 2026, a Criminal Complaint charging Melissa Farris with violations of 18 U.S.C § 1361 (Depredation Against U.S. Property) and 18 U.S.C. § 1369 (Destruction of a

Veterans' Memorial) was signed by the Honorable Matthew J. Sharbaugh of the United States District Court for the District of Columbia. Defendant was arrested by the United States Marshals Service at the courthouse for the United States District Court for the Eastern District of Virginia and had her initial appearance. At her initial appearance, Defendant was ordered detained pending a detention hearing in this District. The Government sought a pre-trial detention hearing pursuant to 18 U.S.C. § 3142(f)(2)(A). The Court denied the Government's request for a detention hearing, holding that the Government did not satisfy the threshold requirement for a detention hearing. Accordingly, the Government respectfully requests that the Court reconsider its request for a detention hearing. Additionally, the Government requests the Court add electronic monitoring and a suitable third-party custodian to its release conditions.

## **ARGUMENT**

A court may reconsider its decision regarding pretrial detention at any time before trial if the judicial officer finds that information exists that was not known to the movant at the time and that has a material bearing on the issue of whether there exist conditions for release that would reasonably assure the appearance of such person as required and the safety of any other person and the community. *United States v. Stroy*, No. 20-CR-188, 2020 WL 7042825, at *3 (D.D.C. 2020) (citing *United States v. Bikundi,* 73 F. Supp. 3d 51, 54 (D.D.C. 2014); *see also* 18 U.S.C. § 3142(f)(2)(B). Under the Bail Reform Act, if the Court determines that "no condition or combination of conditions will reasonably assure the appearance of [a defendant] as required and the safety of any other person and the community," the Court shall order a defendant held pending trial. 18 U.S.C. § 3142(e).

In determining whether an individual is a flight risk, the Court weighs four factors: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the

defendant; (3) his history and characteristics; and (4) the nature and seriousness of the danger to any person or the community that would be posed by his release. *See* 18 U.S.C. § 3142(g); *see also United States v. Vasquez-Benitez*, 919 F.3d 546, 551 (D.C. Cir. 2019). "A determination that an individual is a flight risk must be supported by a preponderance of the evidence. *Vasquez-Benitiz*, 919 F.3d at 551.

Here, if released, Defendant presents a clear and unacceptable flight risk. She has no meaningful ties to the community, no stable housing, and no reliable support structure. In light of these circumstances, there is simply no condition—or combination of conditions—that could reasonably ensure her compliance with release requirements or guarantee her appearance in court. Indeed, just three days before the instant offense, she committed another offense on federal property and was issued two citations in which she would have to appear at a later date. Rather than cease her illegal behavior, her criminal activity escalated.

## I. <u>The Nature and Circumstances of this Offense Merits Detention.</u>

Defendant is charged with committing two felony offenses involving vandalizing and damaging the World War II Memorial on August 13, 2026. This was a brazen attack on one of the Nation's most sacred monuments—an enduring symbol of freedom and a solemn tribute to the sacrifice of so many. Defendant did not act on impulse. Instead, the attack was the product of deliberate planning, careful preparation, and a clear intent to defile and desecrate a national treasure recognized worldwide for its significance. Rather than honoring the courage and selflessness of the World War II Veterans, Defendant chose to assault that symbol of sacrifice for her own gain and to make a public spectacle. In broad daylight, while livestreaming on Facebook to solicit donations, Defendant poured detergent into the fountain and spray-painted memorialist stonework. In her own words, she wanted to "look fancy," and have the livestream go "all over the

internet." Defendant's actions are not just criminal, they violate the American values that the Memorial represents.

There is evidence that Defendant intended to strike again. On August 13, 2026, at 3:07 pm, Defendant texted a friend stating that she "feel[s] like [she] can try again."




***Figure 31. Text Message Recovered from Defendant's Phone.***

This text message demonstrates that Defendant intends to cause further harm in the Washington, D.C. area. Defendant's criminal misconduct is escalating in the three weeks she has been in the area. She was first cited for camping on Federal property. Then, she vandalized and defaced the World War II Memorial. Now, Defendant did not receive the attention she craved and her future actions are uncertain.

As a result of Defendant's selfish and disturbing conduct, she has been charged with two felony offenses, each of which carries a maximum penalty of 10 years of incarceration and fines of up to $250,000. Defendant's actions of coming to D.C. to desecrate a Veterans' Memorial and destroy Federal property, all while livestreaming her actions, favor detention.

## II. <u>The Weight of the Evidence Against Defendant Favors Detention.</u>

The second factor to be considered, the weight of the evidence, also favors detention. As outlined above, the Government's case against Defendant is overwhelming. In addition to Defendant admitting to law enforcement that she spray painted the World War II Memorial and publicly livestreaming a recorded video of herself damaging the Memorial, the Government has also collected independent evidence connecting Defendant to these offenses, including, *inter alia*,

(i) an eyewitness; (ii) a photograph taken by the eyewitness of Defendant spray painting the World War II Memorial; (iii) evidence of a distinctive tattoo on Defendant's leg during the commission of the crime, which is consistent with the tattoo that law enforcement observed on Defendant after her arrest on August 14, 2026; and (iv) Defendant's possession of yellow sunglasses and a backpack upon her arrest, which are consistent with the backpack and sunglasses in the photograph taken by the eyewitness.

Here, the weight of the evidence should be considered equally with the other § 3142 factors. In *United States v. Blackson*, following a thorough review of the text of § 3142 and decisions analyzing this factor, Judge Howell found that "the weight of the evidence should not automatically be weighed less than the remaining statutory pretrial detention factors." 2023 U.S. Dist. LEXIS 18988, at *29-30. Instead, "the weight of the evidence against [a] defendant [should] be weighed as all factors are—in accordance with the specific facts of this case—to determine whether pretrial detention is appropriate." *Id.* In an unpublished opinion, the D.C. Circuit affirmed Judge Howell's decision. *United States v. Blackson*, No. 23-3020, 2023 WL 2663034 (D.C. Cir. Mar. 28, 2023). Moreover, the Second Circuit reached the same decision after a thorough and careful analysis of the issue. *United States v. Zhe Zhang*, 55 F.4th 141, 149-150 (2d Cir. 2022). This Court should follow *Blackson* and *Zhang;* this factor should be given no less weight.

Indeed, "if the evidence against a defendant is overwhelming, credible, helpful, and important to the government's case in chief, that may increase the risk that the defendant will flee to avoid future court proceedings and may indicate that the defendant is a present danger to himself or the community if the government's allegations later prove to be true." *Blackson*, 2023 U.S. Dist. LEXIS 18988, at *29-30. Similar to *Blackson*, here, the weight of the evidence increases the prospect that Defendant will flee if released. Accordingly, the second factor favors detention.

## III. Defendant's History and Characteristics also Favor Detention.

The third factor—the history and characteristics of the defendant—favors detention. Defendant does not have any ties to the District of Columbia, is unhoused, has a significant history of violating the law in multiple states, and committed the instant offense after committing a more minor offense just three days earlier.

Defendant's ties appear to be to Kentucky and the Midwest. Other than coming to D.C. to illegally camp on federal property and to commit the instant offense, she does not appear to have any ties to the Washington D.C. community. Because she is unhoused, the tools available to the Court to ensure Defendant's compliance with pre-trial release conditions and return to court are extremely limited as a third-party custodian, home confinement, a curfew, and GPS monitoring appear to be unavailable to the Court in this case. As such, should this Court release Defendant, the only condition available to this Court is her promise to return—a condition she has already demonstrated she is likely to violate. Indeed, after being issued a ticket with a forthcoming hearing date, Defendant went out just three days later to commit another, far more serious, criminal offense—again on Federal property.

Indeed, the facts favoring detention in this case are stronger than those in *United States v. Grabinski*, 2025 U.S. Dist. LEXIS 46315 (2025). In *Grabinski*, the defendant turned himself in to the U.S. Marshals after being released for a week and then being re-indicted[6] on January 16, 2025. *Id*. at 2-4. In addition to turning himself in, the defendant—who was homeless and had no known criminal history—had no issues during the week that he was released before his re-arrest. As the court noted, "[d]uring that brief span of time, Grabinski did not go near the [offense location], did

[6] The defendant was initially indicted in 2022 on two counts: (1) attempted violation of protection of property used by foreign governments, in violation of 18 U.S.C. § 970(a); and (2) attempted arson, in violation of 18 U.S.C. §844. On January 14, 2025, the original indictment was dismissed without prejudice for violation of the Speedy Trial Act and the Government subsequently re-indicted the defendant on identical charges on January 21, 2025.

not attempt to flee even though he was homeless, reconnected with his family, stayed in touch with counsel, and reached out to the Department of Veterans Affairs for assistance with housing and other benefits." *Id*. at 10. Nonetheless, Judge Richard Leon held the defendant pending trial. The Court specifically noted that the defendant "cannot be placed on location monitoring, 'has no ties to Washington, D.C,' and has 'no family or friends here who can house him or watch him.'" In making his finding, Judge Leon stated, "I cannot be reasonably assured he will not return to the [offense location] or flee the area." *Id* at 12-14. The government notes that Judge Leon did order Grabinski detained because it showed by clear and convincing evidence that he was a danger to the community. Importantly, however, the standard to detain a defendant based on a serious risk of flight is merely a preponderance of the evidence. *See supra* at 19.

In addition to the practical challenges of imposing conditions of release, Defendant has multiple convictions and appears unlikely to abide by conditions of release. Her history spans multiple jurisdictions and reflects not only repeated criminal conduct but also prolonged and ongoing failures to comply with court-ordered obligations. In 2011, Defendant was convicted of Operating While Impaired by Liquor in the Michigan 1st District Court (Monroe), case number 2011-11504-OD, and was sentenced to 93 days in jail and 6 months of probation. Critically, the docket reveals that a bench warrant for failing to appear was issued on November 16, 2011—and remained outstanding for a significant period of time. Her non-appearance did not resolve quickly; it led to further compliance issues, including a requested probation show-cause hearing on July 7, 2012 and a probation violation hearing held on August 29, 2012.[7] This extended duration shows that Defendant did not merely miss a single court date—she remained non-compliant for many

---

[7] *See* MiCOURT Case Search for 2011-115043-OD. Available at https://micourt.courts.michigan.gov/case-search/court/D01/case-details?caseId=2011-115043-OD-01&tenantKey=D01-58-0632572-00-00&searchUrl=%2Fcourt%2FD01%2Fsearch%3FlastName%3DFarris%2520%26firstName%3DMelissa%26birthYear%3D1985%26page%3D1.

months.

Additionally, according to Michigan court records, following her conviction for Operating While Impaired by Liquor in case number 2011-115043-OD, Defendant continued to pick up additional charges, including charges related to failure to pay fees, driving with a suspended license, and driving with an expired tag. While those charges resulted in either default judgements or non-convictions, they are illustrative of Defendant's inability to comply with court conditions.

| Michigan Case Number | Filed Date | Disp. Date | Disposition | Charge |
|---|---|---|---|---|
| **2011-115043-OD** | 09/08/2011 | 12/12/2011 | Disposed On Guilty Plea | Operating While Impaired by Liquor (1200) |
| **2011-110160740-SN** | 09/21/2011 | 10/31/2011 | Default Judgment | Failure to Pay Inmate Admission Fee (2264) |
| **2014-141984-ST** | 04/14/2014 | 01/08/2018 | Dismissed By Party | Drove While License Susp/Rev/Den-1st Offense (0741) |
| **2014-141985-SI** | 04/14/2014 | 01/08/2018 | Judgment Rendered | Expired/Invalid Plate (Non Cmv) (099c) |
| **2014-140156612-SN** | 04/29/2014 | 05/19/2014 | Default Judgment | Failure To Pay Inmate Admission Fee (2264) |
| **2014-142469-OT** | 04/30/2014 | 01/08/2018 | Dismissed By Party | Drove While License Susp/Rev/Den-1st Offense (0741) |
| **2014-142470-ON** | 04/30/2014 | 01/08/2018 | Dismissed By Party | Bedford Twp. Municipal C.I. (Drug Para.)-1st Offense (4316a) |

***Figure 32. Chart of Defendant's Criminal Records in Michigan.***

Defendant's pattern of non-compliance appears elsewhere in her record as well. In 2005, she was convicted of Controlled Substance Possession – Marihuana in the same Michigan court, case number 2005-0501274-SM, and sentenced to 6 months of probation. The docket for that case similarly reflects show-cause hearings scheduled on December 7, 2005 and June 20, 2006, again demonstrating repeated difficulties in meeting court-ordered obligations.[8] Defendant's non-

[8] *See* MiCOURT Case Search for 2011-115043-OD. Available at https://micourt.courts.michigan.gov/case-search/court/D01/case-details?caseId=2011-115043-OD-01&tenantKey=D01-58-0632572-00-

compliance continued into 2015 when she was convicted in Toledo, Ohio for Disorderly Conduct Physically Offensive Condition / Risk of Harm.

Defendant's history and characteristics demonstrate that she poses a significant risk of non-compliance with court orders and has no ties to the community. Accordingly, the third factor weighs heavily in favor of continued detention. *See United States v. Munchel*, 991 F.3d 1273, 1281 (D.C. Cir. 2021) (concluding that courts can and should "consider whether it believes the defendant will actually abide by its conditions when making the release determination"); *see, e.g.*, *United States v. Glasgow*, No. 1:20-cr-27-7 (KBJ), 2021 U.S. Dist. LEXIS 109972, at *37 (D.D.C. June 11, 2021).

## IV. Defendant Presents a Risk of Flight.

Defendant presents a serious flight risk. In particular, just one hour after the offense, on August 13, 2026 around 3:07 p.m., Defendant sent electronic messages to a friend in Ohio saying, "[K]now you're at work if I make it home or if I make it through the night without getting arrested intentionally then I'm going to come home." This is supported by evidence recovered from Defendant's phone showing that she was searching the internet for bus tickets and airline tickets between 5:30 p.m. and 6:00 p.m. on August 13, 2026.

---

00&searchUrl=%2Fcourt%2FD01%2Fsearch%3FlastName%3DFarris%2520%26firstName%3DMelissa%26birthYear%3D1985%26page%3D1.




***Figure 33. Evidence from Defendant's phone of internet searches for Greyhound Bus Tickets (Highlighted).***




***Figure 34. Evidence from Defendant's phone of internet traffic at priceline.com (Highlighted).***




***Figure 35. Screenshot from Defendant's phone of flights from DCA to DTT on priceline.com (Highlighted).***




***Figure 36. Photograph on Defendant's of Direction to Ronald Reagan Washington National Airport.***

The risk of flight is further supported by Defendant's text messages. In relevant part, the text messages state:

Melissa [redacted] owner)

Hey sugar plum I'm going to ask you to do the same thing I'm asking your needy to do caught my live video and edit it so that you can see what I did and where to be the front of a video and make it like just a 60-second real to get attention and try and put it out there because they're locking my apps I can't edit the video also if I don't get arrested today I'm just going to come home and you should probably expect me relatively ish depending how fast I can make it home with my two feet

8/13/2026 3:08:39 PM(UTC-4)

Melissa [redacted] (Chest Cavity Monster) (owner)

I know you're at work if I make it home or if I make it through the night without getting arrested intentionally then I'm going to come home

8/13/2026 3:07:38 PM(UTC-4)




***Figure 37. Text Messages from August 13, 2026 Recovered from Defendant's Phone.***

These text messages are of particular concern here because, unlike many defendants who come before this Court, Defendant has no ties to the District of Columbia or the surrounding area. She has no stable residence, no employment, and no family in the region. Further, the family that she has identified as her support system—her daughter and friend—show that they are editing videos to promote her misconduct. She is not returning to the Northern District of Ohio to a stable environment.

As recently as two days before the instant offense, she was sleeping outdoors in public parks. With no community ties, she cannot be released to a viable third-party custodian, cannot be placed on home confinement or curfew, and cannot be reliably supervised through GPS monitoring. Therefore, no condition or combination of conditions would reasonably ensure her appearance in court.

Taken together, evidence of Defendant's plans to leave the Washington D.C. area, Defendant's lack of community ties, absence of a stable living situation, and her documented history of long-standing failures to appear and sustained non-compliance with court orders clearly establish that she poses an exceptionally high risk of flight. These factors make plain that no condition or combination of conditions could reasonably assure her return to court if released. Accordingly, there is no condition or combination of conditions that would reasonably assure that Defendant would return to court if she were released.

## CONCLUSION

The Government respectfully requests that the Court reconsider its denial of the Government's request for detention. Alternatively, the Government requests the Court add electronic monitoring and a suitable third-party custodian to its release conditions.

Respectfully submitted,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

By: *<u>/s/ Charles Klug</u>*
Charles Klug
D.C. Bar No. 1619775
Assistant United States Attorney
601 D Street NW
Washington, D.C. 20530
Charles.Klug@usdoj.gov
Telephone: 202-730-6872

Samuel M. Deau
Assistant United States Attorney
DC Bar No. 90042268
601 D Street NW
Washington, D.C. 20530
Phone: 202-803-1643
samuel.deau@usdoj.gov